Patricia M. EGGER, Administratrix of the Estate of Charles Egger, Deceased, and National Union Fire Insurance Company,

v.

GULF INSURANCE COMPANY, Brownyard Group, Inc., W.H. Brownyard Corporation and/or Brownyard Brothers, Inc., and Aon Risk Services, Inc. of Pennsylvania and Brokerage Professionals, Inc.

Appeal of Gulf Insurance Company.

Superior Court of Pennsylvania.

Argued Sept. 15, 2004.

Filed Dec. 22, 2004.

John J. Barrett, Jr., Philadelphia, for Gulf Insurance Co., appellant.

Thomas W. Hall, Lancaster, for Egger, appellee.

William J. Schmidt, Philadelphia, for Brownyard, appellee.

Before: FORD ELLIOTT, KELLY, and JOHNSON, JJ.

OPINION BY JOHNSON, J.:

¶ 1 In the instant appeal, we are called to review the trial court's grant of summary judgment in favor of plaintiff, Patricia M. Egger (Egger), as Administratrix of the estate of her late husband, Charles Egger. Egger sought relief from Gulf Insurance Company (Gulf) based on a security company's assignment to her of its rights under a Commercial Umbrella Policy (hereinafter "Policy") issued to that security company. Gulf contends that the assignment in this case violated a provision in the Policy, thus Egger lacked standing to bring suit. Alternatively, Gulf argues that the Policy excludes coverage for Egger's husband's death. We find that Egger had standing to seek recovery from Gulf, and that the trial court did not err in granting Egger summary judgment. Accordingly, we affirm.

¶ 2 The event underlying this suit is not subject to dispute.

> On September 5, 1997, Mr. Egger was granted access by [Foulke Associates, Inc. (Foulke)'s] employees to clean a confined space on the roof of a scrubber unit at Philadelphia Electric Company's Eddystone power plant ("PECO"). While in this confined space, Mr. Egger was using a high pressure water jet to clean sulfur dioxide residue from this scrubber unit. After a sudden loss of water pressure to the jet, Mr. Egger lost his balance and the water jet came to rest near the back of his knee. When the water pressure unexpectedly came back on, the water pierced his leg and severed several arteries. Mr. Egger placed an emergency call for help to Foulke's personnel, however it took approximately twenty minutes for them to arrive to assist him. After arriving on the scene without rescue or first aid equipment, Foulke's personnel returned to Mr. Egger and determined that instead of administering first aid, they should first retrieve Mr. Egger from the confined space. In the meantime, Mr. Egger bled to death.

Trial Court Opinion I, 9/11/02 (T.C.O. I), at 2.

¶ 3 Egger sued Foulke for her husband's death on various grounds, including failure to adequately train its personnel, failure to maintain adequate rescue equipment at or near the confined space in which her husband was injured, failure to respond timely to the emergency situation, and failure to administer appropriate first aid. Just before the jury verdict, on February 7, 2001, Gulf denied umbrella coverage to Foulke. Immediately thereafter, and prior to a jury verdict, Foulke reached a settlement agreement with Egger. In consideration for Egger's agreement not to enforce any judgment beyond the $1 million provided by Foulke's general liability insurance policy, Egger accepted $825,000 and an assignment to Egger of Foulke's rights under the Gulf Policy. On February 9, 2001, the jury returned a verdict against Foulke in the amount of $3.5 million. Following the grant of Egger's motion for delay damages, final judgment was entered against Foulke in the amount of $3,837,965.75. Egger received $825,000, per her agreement with Foulke, but has yet to recover the remaining $3,012,965.75. (Egger has settled other claims against PECO and National Liquid Blasting, Inc., manufacturer of the water jet.) On May 18, 2001, Egger brought the instant action against Gulf alleging breach of contract and bad

faith. On May 20, 2002, the parties filed cross-motions for summary judgment.

¶ 4 On September 11, 2002, the trial court issued an Opinion and Order denying both parties summary judgment. As a preliminary matter, the court ruled that Foulke's assignment to Egger was valid. The court recognized some confusion under Pennsylvania law concerning whether general clauses requiring an insurer's consent prior to an effective assignment of a policy, such as that which appears in Gulf's policy with Foulke, should preclude only "pre-loss" assignments. After exhaustively analyzing Pennsylvania law as interpreted both by state and federal courts, and by reference also to decisions in other jurisdictions permitting "post-loss" assignments notwithstanding such clauses, the trial court concluded that, pursuant to its reading of *National Memorial Services, Inc., v. Metropolitan Life Insurance Co.*, 355 Pa. 155, 49 A.2d 382 (1946), Foulke's assignment of its rights under the Gulf Policy was valid. T.C.O. I at 7–8.

¶ 5 The trial court denied the parties' cross-motions for summary judgment, however, because it found genuine issues of fact material to the case. The first factual issue the trial court found indissoluble on summary judgment was whether Foulke's "Plant Protection Services" were performed in connection with "Security Guard Services." This issue orbited around the fact that those two functions were subject to separate purchase orders and contracts between Foulke and PECO, and Gulf's contention that the neglect in question occurred in connection with Foulke's plant protection service, which Gulf argued was not encompassed under the Policy. T.C.O. I at 12–16. The second issue of material fact found problematic by the trial court concerned whether Foulke was "engaged in the business of providing medical services," which, if true, might bring the incident under an express policy

exclusion in Foulke's umbrella coverage. T.C.O. I at 16–18.

¶ 6 Following this ruling, however, the trial court accepted additional argument and submissions from the parties, and changed course on its denial of summary judgment. Noting that "[i]interpretation of an insurance contract is a matter of law for the court," Trial Court Opinion II, 7/16/03 (T.C.O. II), at 4 (citing *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 390 (1986)), the trial court found that certain ambiguities inhered in the insurance contract and that Egger therefore was entitled to summary judgment on the issue of coverage. T.C.O. II at 5. Consequently, the court vacated only that part of its September 11, 2002 Order denying summary judgment, and granted summary judgment to Egger and against Gulf in the amount of $3,481,849.42. T.C.O. II at 6. It held under advisement whether Egger was entitled to attorney fees and costs, and whether and when to hold a trial on Gulf's alleged bad faith. T.C.O. II at 6. By Order dated August 11, 2003, by stipulation of the parties, the damage award was reduced to $3,352,370.57. Following bench trial, on March 10, 2004, the trial court entered judgment in favor of Gulf on Egger's claim of bad faith. Finally, Gulf sought this appeal, which elicited a trial court opinion dated April 29, 2004, reaffirming the court's satisfaction with its Supplemental Opinion of July 16, 2003 (T.C.O. II.).

¶ 7 On appeal, Gulf raises the following questions:

1. Does an assignee have standing to sue where the insured's assignment of its interests under the insurance policy is made in direct violation of the plain terms of the policy requiring the insurer's consent and before the loss occurs?

2. Is insurance coverage provided where the policy specifically excludes coverage for activities not performed in connection with security guard or investigative operations and the activities in question were not provided by security guards, but rather by separate, specialized employees operating under a different contract?

3. Is insurance coverage provided where the policy specifically excludes coverage for medical services provided as part of a business or for profit and not incidental to security guard services, and where the actual services provided were medical in nature and were provided by a business for a separate price and under a separate contract from that relating to security guard services?

Brief for Appellant at 5.

¶ 8 The first question raised by Gulf concerns Foulke's ability to assign to Egger its right to recover under the Policy. If that assignment is invalid, Egger lacks standing to sue in Foulke's place, in which case Egger's other issues on appeal are moot. *See Fran & John's Doylestown Auto Center, Inc., v. Allstate Ins. Co.,* 432 Pa.Super. 449, 638 A.2d 1023, 1025–27 (1994). Accordingly, we cannot consider the trial court's rulings regarding the legal effect of the Policy unless we determine that Foulke's assignment was proper and effective.

¶ 9 We begin with the Policy's express restriction on assignment of rights and duties.

**K. Transfer of Your Rights and Duties under This Policy.** Your rights and duties under this policy may not be transferred without our prior written consent, except in the case of death of an individual "Named Insured".

Policy at 12, Reproduced Record (R.) at 559a. Gulf summarizes its argument regarding Foulke's attempt to assign to Egger its rights under the Policy as follows:

Egger lacks standing to sue because the purported assignment of Foulke's policy rights to Egger is invalid. Specifically, Egger was not a party to the insurance contract between Foulke and Gulf nor was Mr. Egger an insured under the Gulf policy. Thus, Egger lacks standing to bring *any* claim against Gulf unless some other vehicle gives her the legal right to bring her claims. Here no such right exists since, contrary to the explicit language in the policy, Gulf's written consent prior to making the assignment was never obtained. In fact, Gulf was never even *asked* to consent to an assignment. Moreover, the purported assignment occurred before the loss occurred and Gulf's obligation had become fixed. Thus, under well settled Pennsylvania law, said assignment was invalid.

Brief for Appellant at 24 (emphasis in original).

¶ 10 Unfortunately, contrary to Gulf's assertion, Pennsylvania law is anything but "well settled" on the issue at hand. Indeed, we very recently recognized, but found no cause to resolve, "the conflict in this jurisdiction regarding the validity of non-assignment clauses after a loss has occurred." *Ins. Adjustment Bureau, Inc., v. Allstate Ins. Co.,* 860 A.2d 1038, 2004 WL 2190128, *3 n. 1 (Pa.Super.Sep.30, 2004). This observation is echoed by the trial court's discussion in its first opinion, which noted that "Pennsylvania law is unclear on this issue whether general stipulations prohibiting assignments absent an insurer's consent ... should apply only to pre-loss assignments." T.C.O. I at 4. Moreover, our research discloses that caselaw is not entirely conclusive regarding when a "loss" occurs.

¶ 11 Gulf relies almost exclusively on this Court's decisions in *Fran & John's*

and *High–Tech–Enterprises., Inc., v. General Accident Insurance. Co.,* 430 Pa.Super. 605, 635 A.2d 639 (1993), for the proposition that assignment of rights under the Policy without Gulf's consent is *ipso facto* improper. Brief for Appellant at 26–28. Alternatively, it argues that even if Foulke's assignment would be proper following the occurrence of the loss in question, here that loss was not "fixed" at the time of assignment, because the attempted assignment preceded the jury verdict that it argues created Gulf's putative liability. Brief for Appellant at 28–38.

¶ 12 *Fran & John's* and *High–Tech–Enterprises* do not differ in any material regard, hence we restrict our analysis to the former. In that case, appellant autobody shop disputed with appellee insurer regarding the value of certain repairs. Appellant requested and received from each insured implicated in the case assignment to appellant of his or her claim against the insurer. *See* 638 A.2d at 1024. The policies in question, however, expressly required written consent of the insurer to effect such an assignment. *See id.* at 1025. The parties did not contend that the policy was ambiguous on this point, but appellant maintained that the assignments appellant had secured from the insureds in effect "did not transfer the policies" but merely transferred "the insureds' contractual right to payment from appellee for repair work to their damaged vehicles." *Id.*

¶ 13 We were unpersuaded. After noting our Supreme Court's definition of "assignment" as typically entailing "the transfer of one whole interest in an estate, chattel, or other thing," *id.* (quoting *In re Purman's Estate,* 358 Pa. 187, 56 A.2d 86 (1948)), we concluded that "Appellant's reasoning that the Assignments in question transfer less than the insureds' entire contractual interest[s] in or right[s] under the policies stands the transfer provision of

the policies on its head." *Id.* (footnote omitted). Characterizing appellant's argument as "semantical [*sic*] gamesmanship," we found the non-assignment clause "to be susceptible of no possible meaning other than to prohibit *any* transfer without appellee's consent." *Id.; accord High–Tech–Enterps.,* 635 A.2d at 641–42. We reached this ruling in keeping with our courts' oft-stated commitment to interpret the language of an insurance policy according to its plain meaning. *See Lititz Mut. Ins. Co. v. Steely,* 567 Pa. 98, 785 A.2d 975, 978 (2001) ("[T]he goal of interpreting an insurance policy ... is to determine the intent of the parties as manifested by the language of the policy."); *Hutchison,* 519 A.2d at 388 ("The law will not imply a different contract than that which the parties have expressly adopted. To imply covenants on matters specifically addressed in the contract itself would violate this doctrine."); *Wagner v. Erie Ins. Co.,* 801 A.2d 1226, 1231 (Pa.Super.2002).

¶ 14 Neither *Fran & John's* nor *High–Tech–Enterprises* considered, however, our Supreme Court's holding in *National Memorial Services, Inc., v. Metropolitan Life Insurance Co.,* 355 Pa. 155, 49 A.2d 382 (1946), on which the trial court substantially relied in upholding Foulke's assignment to Egger of its rights under the Policy. Notwithstanding this Court's more recent decisions affirming our aim to effect the plain language of an insurance policy, we can only honor those decisions to the extent that they comport with the binding law we find in *National Memorial Services. See Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382, 386 (1985) ("The formal purpose of the Superior Court is to maintain and effectuate the decisional law of [the Supreme] Court as faithfully as possible.")

¶ 15 In *National Memorial Services,* our Supreme Court considered the validity of

two beneficiaries' attempted assignments of their recoveries on a family member's life insurance policy to an undertaker as collateral security, who in turn assigned those claims to National Memorial. *See* 49 A.2d at 382. Metropolitan Life Insurance, however, refused National Memorial's demand for payment under those policies. *See id.* The non-assignment clause of the policies in question provided:

> This Policy may be assigned to any national bank, state bank, or trust company, but any assignment or pledge of this Policy or of any of its benefits to an assignee other than one of the foregoing shall be void. No assignment of this Policy shall be binding upon the Company unless and until it has been filed with the Company at its Home Office or one of its Head Offices. The Company assumes no obligation as to the validity or sufficiency of any assignment.

*Id.*

 ¶ 16 Our Supreme Court began its analysis by recognizing an insurer's interest in restricting an insured's right to assign a policy to a third party. Were it not able to do so, "some improvident or undesirable assignee might allow the policy to lapse for the nonpayment of premiums." *Id.* The Court noted, however, that "there seems to be no sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured." *Id.* at 382–83. The Court continued:

> Moreover, the general principles applicable to the interpretation of insurance policies further support our interpretation. Text writers and judicial decisions very generally recognize that stipulations in policies forbidding an assignment, except with the insurer's consent, apply only to assignments before loss or death of the insured or the maturity of the policy. **An assignment of the poli-**

**cy or rights thereunder after the occurrence of the event, which creates the liability of the insurer, is not, therefore, precluded.** Couch Encyclopedia of Insurance Laws, Vol. VI, § 1459, p. 5275, states this principle in the following language: 'After a loss has occurred, the right of the insured or his successor in interest to the indemnity provided in the policy becomes a fixed and vested right; it is an obligation or debt due from the insurer to the insured, subject only to such claims, demands, or defenses as the insurer would have been entitled to make against the original insured.' This same authority states, § 1459, p. 5277: 'As a matter of fact, a provision in a policy, prohibiting an assignment after loss has occurred, is generally regarded as void, in that it is against public policy so to restrict the relation of debtor and creditor by restricting or rendering subject to the control of the insurer an absolute right in the nature of a chose in action.'

*Id.* at 383 (emphasis added).

 ¶ 17 We note two crucial nuances in this passage, both of which support the trial court's ruling that Egger had standing to bring suit against Gulf. If we were to accept Gulf's assertions on this point, we would have to hold that the "chose in action" referred to at the end of this passage only comes into being after a jury verdict is entered fixing the precise damages to which the insured is entitled. Such a ruling, however, would contradict the common definition of "chose in action." Black's Law Dictionary provides the following definition of that term:

> Right of proceeding in a court of law to procure payment of sum of money, or right to recover ... a sum of money by action. A personal right not reduced into possession but recoverable by a suit at law. * * * The phrase includes ...

all property in action which depends entirely on contracts express or implied. A right to receive or recover a debt, demand, or damages on a cause of action *ex contractu* or for a tort or omission of a duty.

BLACK'S LAW DICTIONARY 219 (5th ed.1979) (citations omitted); *see* BLACK'S LAW DICTIONARY 234 (7th ed. 1999) ("The right to bring an action to recover a debt, money, or thing."). We note that under this definition, a chose in action clearly encompasses an inchoate right such as the right to recover on an insurance policy that comes into being at the time of a covered injury. This reading of *National Memorial Services* is further supported by the Court's reference to "such claims, demands, or defenses as the insurer would have been entitled to make against the original insured." 49 A.2d at 383. Clearly, were there no assignable right to recover until a jury returned a verdict in favor of the insured—thus "fixing," on Gulf's account, the coverage owed—then any reference to an insurer's right to raise "defenses" would be gratuitous. In the absence of more compelling reasons than those presented in the instant case, we cannot read this language out of binding decisional law.

¶ 18 This does not end our inquiry, however, because Gulf's arguments concerning when a loss is "fixed" require consideration. Gulf argues that the loss in this case was not "fixed" until the jury returned its verdict, one day *after* Foulke assigned to Egger its rights to the Gulf policy. Gulf attempts to distinguish *National Memorial Services* on grounds that the policy in that case was a life insurance policy which was triggered by the death of the insured, while in the instant case only the jury verdict triggered the liability in question. In a footnote, Gulf directs us to policy language that provides:

## I. Coverage

(1) We will pay on behalf of the "Insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law shall become legally obligated to pay as damages for:

 (a) "Bodily Injury"; or

 (b) "Property Damage";

arising out of an "Occurrence" to which this insurance applies. This insurance only applies to "Bodily Injury" or "Property Damage" [w]hich occurs during the POLICY PERIOD stated in Item 2 of the Declarations (the "Policy Period").

(2) We will further pay on behalf of the "Insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law shall become legally obligated to pay as damages for:

 (a) "Advertising Injury"; or

 (b) "Personal Injury" '

first committed during the POLICY PERIOD stated in Item 2 of the Declarations (the "Policy Period").

Brief for Appellant at 29 n. 10 (quoting Policy at 1, R. at 548a). In both ¶ (1) and ¶ (2), Gulf observes, the Policy envisages indemnification, with caveats, for liabilities that the insured "by reason of liability imposed by law shall become legally obligated to pay as damages" for covered injuries. Thus, it contends, fixation of the relevant liabilities occurs only once the jury verdict is tendered. Consequently, the rationale behind declining to enforce non-assignment clauses following fixation of losses does not apply in this case.

¶ 19 We disagree both with this analysis and with Gulf's characterization of *National Memorial Services*. As noted above, the harm against which *National Memorial Services* permits insurers to protect

themselves by way of non-assignment clauses is that which occurs when "some improvident or undesirable assignee might allow the policy to lapse for the nonpayment of premiums." 49 A.2d at 382. Similarly, as Gulf itself notes, Couch's Cyclopedia of Insurance Law emphasizes the goal of protecting an insurer from any additional risk imposed when an assignment changes the nature of the risk originally assumed. Brief for Appellant at 30 (citing Couch, CYCLOPEDIA OF INSURANCE LAW 2d § 63:31). Here, however, while the precise dollar amount of the loss had not been fixed at the time of the assignment—indeed, whether Gulf would owe *anything* to Egger under the jury verdict was not yet clear—it lost nothing insofar as the assignment was subject "to such claims, demands, or defenses as the insurer would have been entitled to make against the original insured." *Nat'l Mem. Servs.*, 49 A.2d at 383. The risk, although not yet quantified to the penny by a jury, was in principle triggered by the injury itself and Foulke's personnel's conduct in response thereto, matters that occurred long before Foulke's assignment of the policy to Egger. We cannot let the language of the Policy outweigh the clear policy embodied by our Supreme Court in *National Memorial Services*. Accordingly, we conclude that Foulke's assignment of its right to recover from Gulf is effective, and that Egger therefore has standing to bring the instant litigation against Gulf.

¶ 20 Having concluded that Egger has standing, we proceed to consider Gulf's arguments that, even if the assignment was effective, the Policy excludes coverage for the injury in question. On these remaining arguments, all asserting that the trial court erred in granting summary judgment to Egger, several basic principles govern our review.

¶ 21 [W]hen reviewing summary judgment cases:

> [W]e must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. In order to withstand a motion for summary judgment, a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Finally, we stress that summary judgment will be granted only in those cases which are clear and free from doubt. Our scope of review is plenary.

*[Fayette County Hous. Author. v. Hous. & Redev. Ins. Exch.*, 771 A.2d 11, 13 (Pa.Super.2001) (*en banc*)].

Interpretation of an insurance contract is a matter of law and is therefore generally performed by a court rather than by a jury. In interpreting the language of a policy, the goal is to ascertain the intent of the parties as manifested by the language of the written instrument. Indeed, our Supreme Court has instructed that the polestar of our inquiry is the language of the insurance policy.

Where the language of the insurance contract is clear and unambiguous, a court is required to give effect to that language. When construing a policy, words of common usage are to be construed in their natural, plain and ordinary sense and we may inform our understanding of these terms by considering their dictionary definitions.

While a court must not distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity, it must find that the contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.

*Wagner*, 801 A.2d at 1230–31 (most citations, internal quotation marks, and modifications omitted).

¶ 22 With its second question, its first question on the merits, Gulf argues that there was a contractual distinction between Foulke's services under its contract with PECO for security guard or investigative operations and its separate contract with PECO for "Plant Protection Services." In effect, Gulf argues that only the former were protected under the Policy, while it was under the ambit of the latter service that Foulke was acting when it attempted to address the decedent's injuries immediately after the accident.

¶ 23 First, Gulf argues from the Policy's Professional Liability Exclusion, which provides as follows:

THE ENDORSEMENT CHANGES
THE POLICY. PLEASE READ
IT CAREFULLY.

PROFESSIONAL LIABILITY
EXCLUSION

This policy does not apply to any error, omission, malpractice or[ ]mistake of a professional nature committed or alleged to have been committed by or on behalf of the Insured in the conduct of any of the Insured's business activities; **however, the exclusion does not apply to the Insured's operations only in connection with security guard or investigative operations.**

\* \* \* \* \* \*

This policy is further extended to cover "Incidental Malpractice."

As used in this endorsement "Incidental Malpractice" means "Bodily Injury" resulting from the rendering of or failure to render the following services by an "Insured":

(A) Medical, Surgical, Dental, X–Ray or Nursing service or treatment or the furnishing of food or beverages in connection therewith; or

(B) the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

But only if such services are provided incidentally to other operations of the "Named Insured" and not for the purpose of generating remuneration or profit.

Such "Incidental Malpractice" coverage does not include:

(1) Expenses incurred by the Insured for first-aid to others at the time of the accident;

(2) Any Insured engaged in the business or occupation of providing any of the services described under (A) and (B) above;

(3) Injury caused by any indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under (A) and (B) above.

ALL OTHER TERMS AND
CONDITIONS REMAINS
UNCHANGED.

R. at 537a (emphasis added). Gulf distils this passage to a two-question contingent inquiry with which we agree.

Thus, as applied to this matter, coverage is excluded if any of the following factual scenarios [is] true:

1. The Plant Protection Services that caused Mr. Egger's death were not provided in connection with Foulke's security guard or investigative operations; *or*

2. The Plant Protection Services that caused Mr. Egger's death were provided in connection with Foulke's security guard or investigative operations, however, these were medical services that were not incidental to Foulke's security [g]uard services, but rather were for the purpose of generating remuneration or profit.

Brief for Appellant at 40.

¶ 24 In the trial court's Supplemental Opinion, in which it reversed its earlier decision denying both parties' motions for summary judgment, the court found the Policy to be ambiguous in crucial ways, and thus interpreted the ambiguous language in Egger's favor. T.C.O. II at 4–5 (citing *Madison Constr. Co. v. Harleysville Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999)). It noted that "[t]o prevail, the insurer must prove that the language of the insurance contract is clear and unambiguous." T.C.O. II at 4 (citing *White v. Keystone Ins. Co.*, 775 A.2d 812 (Pa.Super.2001)). It found, as a matter of law, that terms crucial to the interpretation of the Policy were not defined by the Policy, including "security guard services," "investigative services," "professional nature," and "in the business or occupation of providing medical services." T.C.O. II at 5. The trial court therefore concluded that

the issue whether the medical services provided by Foulke to Mr. Egger were so fundamentally different from the security guard services so as to be excluded under the policy is subject to differing, yet reasonable interpretations under the policy. This is particularly

so when viewed in light of the unique facts of this case, as well as the particularities of security guard services provided at an industrial plant generally. Because of these ambiguities, this court is compelled to find that coverage indeed exists in the pertinent circumstances.

T.C.O. II at 5–6.

¶ 25 Gulf argues in response to this ruling that "security guard services" and "professional nature" are defined in Foulke's application packet for the Policy, thus these terms are not ambiguous. Brief for Appellant at 45–47. Gulf relies in particular on the fact that Foulke, in its Professional Liability Application for Private Security Agencies, carefully breaks out its revenue from all of its businesses by numerous categories, R. at 562a, and goes on in that same document to indicate its responsibilities at PECO as follows: "Control, access and protect property." R. at 577a. Gulf thus contends that these are the "professional activities" for which Foulke sought umbrella coverage, and that "any other 'professional' activities, outside of the scope of Foulke's representations, are excluded." Brief for Appellant at 47. To further augment its argument that Foulke's negligent care did not occur "in connection with security guard or investigative operations," Gulf relies substantially on the fact that separate purchase orders were issued by PECO for Security Guard Services and for Plant Protection Services, and that Foulke employees under the plant protection services rubric had separate qualifications, and were more highly compensated, than Foulke employees working under the security guard rubric. Brief for Appellant at 47–50.

 ¶ 26 While these two points together comprise an interesting argument, we note that Gulf has failed to provide authority for the proposition that book-keeping

practices, in themselves, can work to constrain the bounds of a policy exclusion. It is the case that "[a]n application is an integral part of a policy, and the questions and answers contained therein are material to the risks which both the company and the insured assume." *Peters v. World Mut. Health & Accident Ins. Co.*, 206 Pa.Super. 406, 213 A.2d 116, 118 (1965). The application documents in this case, however, are no more clear than the policy of which they are an "integral part." First, Foulke lists in its application $95,000 in "Unarmed Payroll" under the category of "Other," R. at 562a, and second, the five word description of Foulke's responsibility at PECO, "Control, access and protect property," R. at 577a—itself ambiguous in virtue of unintuitive comma placement—does not conclusively indicate whether this description incorporates or excludes all administration of first-aid or incorporates the activities of those Foulke personnel acting under the "Plant Protection Services" purchase order.

¶ 27 While *Peters* indeed directs us to consider the application documents in question as part and parcel of the policy, it also speaks in strong terms of the burden that rests on Gulf to prove its policy exclusions expressly precluded the claim in question:

> The law is well established that an insurance policy is to be construed most strongly against the insurer who has prepared it. If reasonably susceptible to two interpretations, it is to be construed in favor of the insured in order not to defeat, without plain necessity, the claims to indemnity which it was the insured's object to obtain.

213 A.2d at 118. We agree with the trial court that Gulf has failed to satisfy its burden to show that, as a matter of the plain language of the policy exclusion, the negligent care administered (or not administered) to the decedent following his injury was not administered "in connection with" Foulke's security guard services. Rather, we find that whether the care given by Foulke in this case was rendered under the Plant Protection Services purchase order or otherwise, nothing in the policy exclusion or elsewhere unambiguously classifies that care as anything other than in connection with security guard services. While the application is part of the Policy, *per Peters*, the purchase orders are not. We are not swayed that PECO's or Foulke's book-keeping practices are sufficient to obviate the Policy's inherent ambiguity.

¶ 28 Gulf also argues at length from the extensions and restrictions stated in the Policy that follow the initial paragraph of the Professional Liability Exclusion. Brief for Appellant at 53–59; R. at 537a. We grant *arguendo* Gulf's assertion that, where various medical services are rendered for "generating remuneration and profit," malpractice arising therefrom is not covered by the Policy. R. at 537a. This does not lead us to upset the trial court's ruling, however, because we find ambiguity on the *prior* question of whether the care in question occurred "in connection with security guard or investigative operations." This ruling does not permit us to proceed further; at a prior stage in our analysis, we found critical ambiguity in the Policy, which we are bound by law to resolve in Egger's favor. Similarly, we reject Gulf's contention that, at the very least, we must remand to the trial court to resolve lingering issues of fact, especially concerning "the services provided to Mr. Egger and the cause of the loss." Brief for Appellant at 59. "Interpretation of an insurance contract is a matter of law." *See Wagner*, 801 A.2d at 1230. This case entails nothing more.

¶ 29 Accordingly, our inquiry ends. The trial court erred neither in ruling the poli-

cy ambiguous on this crucial question nor in ruling that the ambiguity in question must be construed in favor of coverage. Finally, the trial court did not err in determining that these conclusions could be reached as a matter of law without the necessity of further fact-finding. Consequently, we affirm the trial court's order granting summary judgment in favor of Egger.

¶ 30 Order AFFIRMED.