785 A.2d 975

**LITITZ MUTUAL INSURANCE CO., Appellee,**

v.

**Clifford STEELY, Barbara Steely, Steven Brown, A Minor, by Ethel Brown, His Guardian, Jack Yeager and Shirley Yeager, Appellants (Two Cases).**

Supreme Court of Pennsylvania.

Argued April 30, 2001.

Decided Nov. 30, 2001.

Paul F. Lantieri, Philadelphia, for Jack Yeager.

Peter Russell Kohn, Philadelphia, for Steven Brown/Ethel Brown.

Rory Oliver Connaughton, Robert M. Frankhouser, Lancaster, for Clifford and Barbara Steely.

Matthew Hermann Haverstick, amicus curiae, New York, NY, for Federal Home Loan Mortgage Co.

Paul W. Kisslinger, Barry J. Fleishman, amicus curiae, Washington, DC, for Valspar Corp. & National Paint.

John Alexander MacDonald, amicus curiae, Philadelphia, for United Policy Holders.

James R. Segerdahl, amicus curiae, for PPG Industries, Inc.

Timothy J. Huber, Lebanon, for Lititz Mutual Co.

Guy A. Cellucci, Philadelphia, for Environmental Litigation Accoc.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION

SAYLOR, Justice.

The issue to be decided is whether a pollution exclusion clause in a commercial general liability insurance policy precludes coverage for injuries allegedly caused by the ingestion and/or inhalation of lead-based paint.

For approximately five and one-half years between 1988 and 1993, Steven Brown ("Steven"), a minor, resided in a rental property owned by Clifford and Barbara Steely (the "Steelys"). Thereafter, Steven resided for two years in a rental property owned by Jack and Shirley Yeager (the "Yeagers"). In 1996, Steven's mother, Ethel Brown, commenced an action on his behalf against the Steelys and the Yeagers, alleging negligence, breach of implied warranty of habitability, and misrepresentation. The gravamen of the complaint was that, as a result of having ingested and inhaled lead-based paint, which had been present on the interior surfaces of the residences, Steven had sustained serious injury in the form of lead poisoning and consequent neurodevelopmental delay.

For virtually the entire period of Steven's residence on their premises, the Steelys were insured under successive commercial general liability ("CGL") policies issued by Lititz Mutual Insurance Company ("Lititz"). When the Steelys notified Lititz of the lawsuit, the insurer notified them of its intention to defend pursuant to a reservation of rights.[1] Lititz then commenced a declaratory judgment action, seeking a determination that coverage of claims arising from residential lead paint poisoning was precluded by the policy's "pollution exclusion."[2] This provision excluded coverage for:

> bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
>
> (a) at or from premises owned, rented or occupied by the named insured[.]

The policy provided further that

> [p]ollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes,

---

**1.** The Superior Court's statement that Lititz "refused to defend," see *Lititz Mut. Ins. Co. v. Steely*, 746 A.2d 607, 609 (Pa.Super.1999), is incorrect.

**2.** Although the Yeagers were not insured by Lititz, Lititz named them as defendants, along with the Steelys and Steven Brown, to comply with the requirement of the Declaratory Judgment Act that all persons be made parties whose interest would be affected by the declaration sought. See 42 Pa.C.S. § 7540(a). The Yeagers have filed a brief in support of the Steelys in this appeal.

acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Lititz filed a motion for summary judgment, which the trial court denied, finding that both the definition of pollutants and the prescribed methods of transmission were ambiguous when applied to the facts of the case. Since lead paint was not listed among or closely related to the examples of pollutants offered by the policy, the trial court reasoned, it was possible that the exclusion was not meant to, and did not, apply to residential lead paint poisoning claims. As for the methods of transmission, the trial court noted that numerous jurisdictions had determined that terms such as "discharge" and "dispersal" were terms of art intended to denote environmental pollution. In the court's view, that interpretation of the terms was entitled to as much weight as any other, and rendered the terms ambiguous with respect to residential pollution. Finally, the court noted, as a supporting although not decisive factor, the divided state of the law among other jurisdictions on this issue. Having concluded that the exclusion was ambiguous, the court, as required, *see Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 304–05, 469 A.2d 563, 566 (1983), resolved the ambiguity in favor of the insured and denied the motion.[3]

The Steelys then filed their own motion for summary judgment, and were subsequently joined in that motion by the Yeagers and Steven Brown (collectively, "Appellants"). Attached to Steven Brown's joinder were the affidavits of Ellen K. Silbergeld, Ph.D., a toxicologist; James Shockley, a paint expert; and James E. Girard, Ph.D., a chemist.[4] The experts'

3. Pursuant to Section 702(b) of the Judicial Code, 42 Pa.C.S. § 702(b), and Pennsylvania Rule of Appellate Procedure 1311, the trial court certified that its order involved a controlling question of law as to which there was a substantial ground for difference of opinion. Lititz's subsequent petition for permission to appeal from the order was denied by the Superior Court.

4. Although the three affidavits had been prepared in the course of an unrelated federal lawsuit, *Nautilus Ins. Co. v. Gornish*, C.A. No. 95–4531 (E.D.Pa.), counsel for Steven Brown had served them on Lititz during discovery and had assured Lititz that the three experts would testify in accordance with their affidavits if the case went to trial.

affidavits, which were largely consistent with each other, made the following points: The lead that is contained in lead-based paint is never discharged or released from the paint into the atmosphere. Instead, the paint, applied to the interior surfaces of a building, deteriorates over time, and through this process of surface degradation, small fragments, chips, and microscopic particles of the paint become available for inhalation or ingestion. Lead-based paint is the principal cause of childhood lead poisoning in the United States today, but it is paint, not lead in pure elemental form, that is being inhaled or ingested.

Following oral argument, and for the reasons cited in its previous decision denying Lititz's motion for summary judgment, the trial court granted Appellants' motion for summary judgment to the extent of finding that Lititz had a duty to defend the Steelys. Explaining that resolution of the question of Lititz's duty to indemnify would be premature, the court dismissed without prejudice the parties' request for a ruling on that issue. Both parties appealed to the Superior Court.

▆▆▆ The Superior Court reversed, citing as controlling precedent our recent decision in *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100 (1999). *See Lititz Mut. Ins. Co. v. Steely*, 746 A.2d 607 (Pa.Super.1999). *Madison* concerned a pollution exclusion clause that was almost identical to that in the Lititz policy.[5] The issue was whether such a clause served to relieve Harleysville of the obligation to defend its insured, Madison, in a personal injury action brought by an individual who had been overcome by fumes emanating from Euco Floor Coat, a curing agent that Madison had applied to newly poured concrete trenches. This Court began by emphasizing that the goal of interpreting an insurance policy, like the goal of interpreting any other contract, is to determine the intent of the parties as manifest-

5. In pertinent part, the exclusions defined "pollutants" identically, but differed in the terms used to describe the actions that will trigger the exclusion. The Lititz policy refers to the actual, alleged, or threatened "discharge, dispersal, release or escape" of pollutants; the Harleysville policy used those terms and, in addition, "seepage" and "migration."

ed by the language of the policy, *see Madison,* 557 Pa. at 606, 735 A.2d at 106 (quoting *Gene & Harvey Builders v. Pennsylvania Mfrs. Ass'n,* 512 Pa. 420, 426, 517 A.2d 910, 913 (1986)), explaining that a court is required to give effect to such language, if unambiguous, but to interpret it in favor of the insured, if otherwise. *See id.* (quoting same). Ambiguity exists if the language at issue could reasonably be construed in more than one way. *See id.* (citing *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 201, 519 A.2d 385, 390 (1986)). Whether ambiguity exists cannot be resolved in a vacuum, we noted, but must instead be considered in reference to a specific set of facts. *See id.*

Applying this analytical framework, *Madison* considered first whether the policy's definition of "pollutant" applied unambiguously to the product at issue. This question was answered affirmatively on the basis of the record: a manufacturer's report referred to the irritating effects of Euco Floor Coat and noted that its constituents included chemicals known to be toxic. *See id.* at 606–08, 735 A.2d at 107–08. The Court turned then to the more difficult question of whether the exclusion's requirement of an "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape" of a pollutant was similarly unambiguous when judged against the facts of the case. Noting that the policy did not define those terms, we proceeded to determine their natural, plain, and ordinary meanings, and drew from those meanings the conclusion that the exclusionary language had been intended "to comprehend all such types and degrees of movement." *Id.* at 608–09, 735 A.2d at 108. In reaching this conclusion, the Court specifically rejected the argument, made by Madison and accepted by the trial court, that the words at issue were terms of art in environmental law and, as such, implied a discharge or dispersal "into the environment." Such argument, *Madison* explained, did not comport with the principles of contract interpretation previously cited: the trial court, in striving to discern the considerations underlying the policy language, had failed to acknowledge and apply its plain meaning. *See id.* at 609–610, 735 A.2d at 108.

Finally, this Court considered but rejected Madison's claim that the injured party's complaint alleged acts of negligence that did not "arise out of" the use of Euco Floor Coat. All of the plaintiff's claims of negligence, we reasoned, rested upon the fundamental averment that, while attempting to set up an exhaust fan to dissipate the fumes emanating from the curing agent, the plaintiff was suddenly overcome by those fumes. *See id.* at 611, 735 A.2d at 109. Accordingly, we concluded that all of the plaintiff's alleged injuries "arose out of" the release of fumes from the curing agent, and, therefore, that the pollution exclusion clause precluded coverage for those injuries. *See id.* at 612, 735 A.2d at 110.[6]

In applying *Madison*'s reasoning to the present case, the Superior Court concluded that the trial court had erred in finding that Lititz had an obligation to defend the Steelys. First, the Superior Court rejected the argument of Appellants (there, the appellees) that the exclusion was ambiguous because, if applied as written, it would render every substance in existence a pollutant. *See id.* Under *Madison*, the Superior Court explained, it was necessary to focus on the specific product at issue, and, given the abundance of information detailing the harmful effects of lead-based paint, the exclusion's definition of pollutants clearly and unambiguously applied to that substance. *See id.* at 610–11, 735 A.2d 100. Nor, in the Superior Court's view, was there merit to the argument that lead was never discharged, dispersed, or released from lead-based paint and that the paint itself was not a pollutant. *Madison*, the court noted, had rejected a similar argument

6. Mr. Justice Cappy dissented, expressing agreement with the substantial number of jurisdictions that restrict the exclusion's application to the hazards traditionally associated with environmental pollution. *See Madison*, 557 Pa. at 615, 735 A.2d at 111 (Cappy, J., dissenting). He concluded that the phrase "arising out of" was ambiguous and was therefore to be construed against the drafter. *See id.* In separate dissenting opinions, Mr. Justice Nigro opined that the complainant's injuries did not arise out of the release of pollutants, *see Madison*, 557 Pa. at 615, 735 A.2d at 112 (Nigro, J., dissenting), and Madame Justice Newman found the record inadequate to support a determination that the substance at issue was a pollutant, *see Madison*, 557 Pa. at 617, 735 A.2d at 113 (Newman, J., dissenting).

based on the form of the polluting agent. *See id.* at 611, 735 A.2d 100.

Next, the Superior Court considered whether the exclusion's requirement that the alleged injury arise out of the "actual, alleged or threatened discharge, dispersal, release or escape of pollutants" was similarly unambiguous given the facts of the case. It was unambiguous, the Superior Court concluded, because this Court had determined in *Madison* that the language of the exclusion, listing as it did numerous similar terms such as "discharge" and "dispersal," encompassed "all types and degrees of movement." *Id.* at 612, 735 A.2d 100. Thus, the Superior Court concluded, the exclusion applied to the situation at issue, where lead-based paint, having been applied to the walls of a residence, "over time exfoliated, abraded, flaked, deteriorated or otherwise moved off of the walls as small particles of paint dust." *Id.* In addition, the court noted, the argument that the words in question were environmental terms of art had been expressly rejected in *Madison. See id.* Accordingly, having concluded that there was no coverage and, it necessarily followed, no obligation to indemnify, the Superior Court reversed the trial court's order granting summary judgment to the then-appellees and re-manded for entry of an order in favor of Lititz. *See id.* at 613, 735 A.2d 100.[7] We granted allocatur to determine whether, pursuant to *Madison*, the absolute pollution exclusion clause bars coverage for injuries allegedly arising out of the ingestion or inhalation of lead-based paint.[8]

7. Judge Johnson dissented, reasoning that the pollution exclusion clause was not implicated because the underlying claims did not "arise out of" the discharge, dispersal, release, or escape of pollutants. *See Steely*, 746 A.2d at 613 (Pa.Super.1999) (Johnson, J., dissenting).

8. It appears that, of those jurisdictions that have decided the issue, a majority have found that the pollution exclusion clause does not bar coverage. *See Byrd v. Blumenreich*, 317 N.J.Super. 496, 722 A.2d 598, 600 (1999) (collecting cases); *Danbury Ins. Co. v. Novella*, 45 Conn. Supp. 551, 727 A.2d 279, 282 (1998) (collecting cases, and recognizing an "overwhelming trend" in favor of coverage) (quoting *Sphere Drake Ins. Co. v. Y.L. Realty Co.*, 990 F.Supp. 240, 243 (S.D.N.Y.1997)). *See generally* Kurt C. Schultheis, Note, *Sullins v. Allstate: Lead Paint and the Growing Ambiguity of the Pollution Exclusion Clause*, 27 U. BALT L.REV. 475, 477–78 (1998) (noting a trend in favor of finding coverage,

■   Turning first to the question whether lead-based paint is a pollutant within the meaning of the exclusion, it is apparent that, as in *Madison*, this is the simpler of the two policy terms to construe.   Among the abundant information in support of an affirmative finding, the Superior Court cited the following: the affidavits of Dr. Silbergeld, Dr. Girard, and Mr. Shockley, all of which recognized exposure to lead-based paint as a cause of lead poisoning; the Residential Lead Based Paint Hazard Reduction Act of 1992, which labels exposure to lead-contaminated paint and dust a "hazard"; the Clean Air Act, which identifies lead as a pollutant in the context of ambient air quality; and the fact that the use of lead in residential paint was banned in 1978.   In *St. Leger v. American Fire and Cas. Ins. Co.*, 870 F.Supp. 641 (E.D.Pa.1994), the U.S. District Court for the Eastern District of Pennsylvania noted that ingestion of household dust containing lead from deteriorating lead-based paint is the most common cause of lead poisoning in children.   *See id.* at 643.[9]   As the Court of Claims for the State of New York has observed, lead-based paint is a contaminant that "falls within the general tenor of the specifically listed pollutants."   *Oates v. State of New York*, 157 Misc.2d 618, 597 N.Y.S.2d 550, 554 (N.Y.Ct.Cl.1993); *see also St. Leger*, 870 F.Supp. at 643 (positing that, to argue that a substance which causes such deleterious effects is neither an "irritant" nor a "contaminant," where such terms are to be given their natural, plain, and ordinary meaning, is to "torture the policy language in order to 'create ambiguities where none exist' " (quoting *McMillan v. State Mut. Life Assurance Co. of Am.*, 922 F.2d 1073, 1075 (3d Cir.1990))).   Accordingly, we

and suggesting that "pollution exclusion clauses are not the most effective means to exclude lead paint claims from insurance coverage").

9.   *See generally* Michael B. Sena, *Sorting Out the Complexities of Lead–Paint Poisoning Cases*, 4 J. Affordable Housing & Community Dev L. 169 (Spring 1995) (describing the problem of lead poisoning in children as longstanding and well recognized); Affidavit of Ellen K. Silbergeld, Ph.D. (explaining that exposure to lead-based paint occurs not only through ingestion of the paint, but through "inhalation of household dust contaminated with small particles of [such] paint"); Affidavit of James Shockley (noting that the foremost cause of childhood lead poisoning is "lead-based paint and the accompanying contaminated dust and soil found in older houses").

conclude, as did the Superior Court, that the definition of "pollutant" in the pollution exclusion clause unambiguously encompasses lead-based paint.

■ Next, we consider whether the exclusion's requirement of a "discharge, dispersal, release or escape" of pollutants is also, with reference to the process by which lead-based paint becomes available for ingestion and inhalation, unambiguous. In determining that it is, the Superior Court read the exclusionary language as encompassing all types and degrees of movement. *Steely*, 746 A.2d at 612. The Superior Court was correct to conclude that *Madison* endorses a plain meaning approach. But just as in determining the scope of the term pollutant it is necessary to focus on the particular substance, in determining whether there has been a discharge, dispersal, release, or escape, it is necessary to assess the specific form of movement in question. Thus, we clarify that the critical question is whether the process by which lead-based paint becomes available for human ingestion/inhalation unambiguously involves a type of motion that can be characterized as a discharge, dispersal, release, or escape. *See Danbury*, 727 A.2d at 284 (observing that such terms "limit the ways 'by which the pollutant must travel from a contained place to the injured person's surroundings and then cause injury'" (quoting *Lefrak Org., Inc. v. Chubb Custom Ins. Co.*, 942 F.Supp. 949, 953 (S.D.N.Y.1996))).

On this point, the language used to describe the movement of lead-based paint is instructive. Dr. Silbergeld stated that lead-based paint deteriorates and degrades (slowly or rapidly, depending upon condition and use), and that the painted surface sheds microscopic dust through the process of exfoliation. According to Dr. Silbergeld, this process of surface degradation occurs continuously at a slow rate. Dr. Girard stated that lead-based paint abrades and that it "chips, peels, chalks, or otherwise breaks down into dust." Mr. Shockley explained that lead-based paint deteriorates or abrades, producing paint dust, chips, and flakes. Following the experts' lead, the Superior Court concluded that lead-based paint "over time exfoliated, abraded, flaked, deteriorated or otherwise

moved off of the walls . . . ." *Steely*, 746 A.2d at 612. Indeed, the United States Congress used similar language when, in the Residential Lead Based Paint Hazard Reduction Act, it identified the ingestion of household dust containing lead from "deteriorating or abraded" lead-based paint as the most common cause of lead poisoning in children. *See* 42 U.S.C. § 4851(a).

■ Common to all of these descriptions is the implication that the process by which lead-based paint becomes available for human ingestion/inhalation does not, in the usual case, occur quickly. Rather, the process of surface degradation occurs continually, but at a slow rate. *See Sphere Drake*, 990 F.Supp. at 243 (observing that, in accepted usage, the terms "discharge, dispersal, release, or escape" do not encompass the type of "movement" associated with lead paint poisoning); *Byrd*, 722 A.2d at 602 (noting that "discharge," "dispersal," etc., ordinarily imply an active or clearly perceived physical event, and thus do not apply to the imperceptible flaking of lead paint, which is attributable to an involuntary process that occurs over a considerable period of time).[10]

This, in our view, is the natural, plain, and ordinary meaning of the exclusionary language as it applies (or, more precisely, does not apply) to the dissemination of lead-based paint in a residential setting. One would not ordinarily describe the continual, imperceptible, and inevitable deterioration of paint that has been applied to the interior surface of a residence as a discharge ("a flowing or issuing out"), a release ("the act or an instance of liberating or freeing"), or an escape ("an act or instance of escaping"). *See Madison*, 735 A.2d at 108. Arguably such deterioration could be understood to constitute a "dispersal," the definition of which ("the process . . . of . . . spreading . . . from one place to another," *id.*) may imply a

10. *But see Lefrak*, 942 F.Supp. at 954 (finding it arguable that the degradation process qualifies as a discharge, dispersal, or release); *Peace v. Northwestern Nat'l Ins. Co.*, 228 Wis.2d 106, 596 N.W.2d 429, 440 (1999) (concluding that the chipping, flaking, or deterioration of lead-based paint constitutes a discharge, dispersal, release, or escape); *Auto-Owners Ins. Co. v. Hanson*, 588 N.W.2d 777, 781 (Minn.Ct.App. 1999) (same).

**110**

gradualism not characteristic of the other terms. Any such inconsistency in meaning simply indicates, however, that the exclusionary language does not clearly include or exclude the physical process here at issue, but is, as to that process, ambiguous.[11] Such ambiguity requires that the language be interpreted in favor of the insured. We conclude, therefore, that the pollution exclusion clause does not preclude coverage for the injuries alleged to have occurred in this case.[12]

The order of the Superior Court is reversed.

11. We recognize that the line between plain meaning and untempered literalism is a difficult one to draw, and that, as pertains to the absolute pollution exclusion clause, it must be guided by the decisional law as it develops against the context of individual facts. That the issue of coverage should turn upon such distinctions may well prove frustrating for the insurers who draft the policy, the consumers who purchase it, and the jurists who are required to interpret it. It merits repeating, therefore, that, of those three, it is the drafters of the policy who are in the best position to introduce greater clarity into the process, as, for example, by including in their policies an explicit exclusion for lead-paint poisoning. See, e.g., Sullins v. Allstate Ins. Co., 340 Md. 503, 667 A.2d 617, 624 n. 3 (1995) (recognizing that some policies include such a clause).

12. Subsequent to the grant of allocatur in the present case, this Court was required to address yet another pollution exclusion clause, this one excluding coverage for all but "sudden and accidental" releases of pollutants. See Sunbeam Corp. v. Liberty Mut. Ins. Co., 566 Pa. 494, 781 A.2d 1189 (2001). The Court accepted an insured's argument that, under the law of contracts, evidence of industry custom or trade usage is always relevant and admissible to demonstrate that words used in a commercial contract have a specialized meaning in the trade or industry. See id. at 500, 781 A.2d at 1193. Once such custom or usage is established, the Court continued, it will be considered part of the contract, the presumption being that the contracting parties knew of such custom or usage and contracted with reference to it. See id. Notably, the Court stressed that it was not necessary to demonstrate that the words of a contract were ambiguous before construing them according to industry custom or usage. See id. (citing RESTATEMENT (SECOND) OF CONTRACTS § 220, cmt. d). Thus, where it is asserted that the terms of a policy possess a specialized meaning in the insurance industry, the threshold determination is not the existence vel non of ambiguity, as in Madison, but, rather, whether the assertion of specialized meaning is correct. If it is, the terms at issue are to be given that specialized meaning, and the question of ambiguity does not arise. In a dissenting opinion, which was joined by Mr. Justice Castille, this author expressed the view that the majority's analysis was inconsistent with Madison and that extrinsic evidence is not relevant to the interpretation of a comprehensive general insurance policy unless it is first

determined that the language of the policy is ambiguous. *See Sunbeam,* 566 Pa. at 504, 781 A.2d at 1195 (Saylor, J., dissenting). While the full impact of *Sunbeam* on *Madison* is not presently clear, *Sunbeam*'s effect on the present case is, if anything, to enhance Appellants' position.