903 A.2d 1219

Patricia M. EGGER, Administratrix of the Estate
of Charles Egger, Deceased and National
Union Fire Insurance Company,

v.

GULF INSURANCE COMPANY, Brownyard Group, Inc., W.H.
Brownyard Corporation and/or Brownyard Brothers, Inc. and
AON Risk Services, Inc. of Pennsylvania and Brokerage Profes-
sionals, Inc.,

**Appeal of Gulf Insurance Company.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 2005.

Decided Aug. 23, 2006.

John J. Barrett, Jr., Edward J. Kelbon, Jr., Esq., Karl Stewart Myers, Esq., Philadelphia, for Gulf Insurance Company.

Robert E. Kelly, Jr., Esq., Harrisburg, for amicus curiae Insurance Federation of Pennsylvania.

Thomas Wayne Hall, Esq., Lancaster, for Patricia M. Egger, Administratrix of the Estate of Charles Egger, Deceased, et al.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

## OPINION

Justice NEWMAN.

In this case, we determine whether an assignee has standing to sue an insurer where the insured assigned its interest in an insurance policy without the prior consent of the insurer, contrary to the requirement in the policy. For the reasons that follow, we affirm the Order of the Superior Court that

affirmed the Order of the Court of Common Pleas of Philadelphia County (trial court), which granted summary judgment in favor of the assignee.

## FACTS AND PROCEDURAL HISTORY

On September 5, 1997, Charles Egger (Egger) was cleaning a confined space on the roof of a scrubber unit at Philadelphia Electric Company's (PECO) Eddystone power plant. Foulke Associates, Inc. (Foulke) provided both security guard services and plant protection services to PECO at the power plant under two separate contracts.

Egger was using a high pressure water jet to clean sulfur dioxide residue from this scrubber unit. After a sudden loss of water pressure, he lost his balance, and the water jet came to rest near the back of his knee. When the water pressure suddenly returned, the water pierced his leg and severed several arteries.

Egger placed an emergency call to Foulke personnel, who arrived twenty minutes later, without rescue or first aid equipment. Instead of administering first aid, the Foulke staff decided first to retrieve him from the confined space. During this process, Egger bled to death.

Patricia Egger (hereinafter Appellee or Assignee), the wife of Egger, brought suit against Foulke for, *inter alia*, failing to administer timely first aid, and the case went to trial.[1] Foulke was insured for $1,000,000.00 through a primary general liability insurance policy issued by Security Insurance Company of Hartford (Security).

In addition to this primary liability policy, Foulke maintained an umbrella/excess general liability insurance policy issue (the excess insurance policy) issued by Appellant Gulf Insurance Company (Gulf) with a liability limit of $10,000,-00.00. The term of the policy was from May 14, 1997 through May 14, 1998, and it provided coverage for "Occurrences"

---

1. Appellee settled other claims against PECO and National Liquid Blasting, Inc., the manufacturer of the water jet.

during that period, in the event that damages exceeded the $1,000,000.00 limit of the primary policy.

The policy defined "Occurrence" as "an accident . . . that results in 'Bodily Injury' or 'Property Damage' that is not expected or not intended by the 'Insured.'" Exhibit F, Commercial Umbrella Policy, Supplemental Appendix to Combined Reply in Support of Defendant Gulf Insurance Company's Motion for Summary Judgment, Section IV H.

A provision included in the section of the policy labeled "Conditions" stated that "[y]our rights and duties under this policy may not be transferred without our prior written consent, except in the case of death of an individual 'Named Insured.[2].'" Exhibit F, Commercial Umbrella Policy ["Policy"] Supplemental Appendix to Combined Reply in Support of Defendant Gulf Insurance Company's Motion for Summary Judgment, "Conditions," Section K, "Transfer of Your Rights and Duties under This Policy."

On February 7, 2001, shortly before the jury verdict, Gulf denied excess insurance coverage to Foulke. Immediately after that, and prior to the jury verdict, Foulke and Appellee entered into a settlement agreement. In exchange for Appellee's agreement not to enforce against Foulke any excess judgment beyond the $1,000,000.00 that Foulke insured through its primary general liability policy, Appellee accepted $825,000.00, along with an assignment of Foulke's rights under the Gulf excess insurance policy.[3] On February 9, 2001, the jury returned a verdict against Foulke in the amount of $3,500,000.00. Following the grant of Appellee's Motion for

**2.** In the section labeled "Introduction," the insurance policy defined a "Named Insured" as "any person or organization identified as a 'Named Insured' under INSURING AGREEMENT III." Foulke Associates, Inc. was the "Named Insured." Accordingly, that part of section K that permitted assignment without prior consent in the event of the "death of an individual 'Named Insured'" was not applicable where the Named Insured was Foulke and not an individual.

**3.** PECO received $175,000.00 of the $1,000,000.00 insurance policy as settlement for its cross-claim against Foulke.

delay damages, the final judgment against Gulf totaled $3,837,965.75.

On May 18, 2001, Appellee brought suit against Gulf alleging breach of contract and bad faith in denying coverage. Both parties filed cross-motions for summary judgment, which the trial court denied on September 11, 2002.

The trial court determined that Foulke's assignment to Appellee of its rights under the excess insurance policy was valid, despite the fact that the required notice had not been provided. Citing the decision of this Court in *Nat'l Mem'l Services v. Metro. Life Ins.*, 159 Pa.Super. 292, 48 A.2d 143 (1946), the trial court noted that "Pennsylvania courts have . . . analyzed non-assignment clauses by considering the clear language used and the purposes for which the clauses were inserted." Trial Court Opinion of September 11, 2002 (Trial Court Opinion) at 4.

The trial court denied the parties' cross-motions for summary judgment based on its determination that genuine issues of material fact existed with respect to Gulf's claim that coverage was excluded pursuant to an "Incidental Malpractice" provision of the policy and a Professional Liability Exclusion Endorsement.

Following the parties' submission of supplemental briefs and additional argument, on July 16, 2003, the trial court vacated the portion of its previous Order denying summary judgment to Appellee on the coverage issue, and granted summary judgment to her in the amount of $3,481,849.42, which was reduced by stipulation of the parties to $3,352,370.57.

Following a bench trial, on March 10, 2004, the trial court entered judgment in favor of Gulf on Appellee's claim of bad faith. Gulf timely appealed to the Superior Court, challenging the trial court's grant of summary judgment in favor of Appellee.

A panel of the Superior Court held that Appellee had standing to seek recovery from Gulf and the trial court did not err in granting summary judgment in her favor. *Egger v. Gulf Ins. Co.*, 864 A.2d 1234 (Pa.Super.2004). The court noted

that "Pennsylvania law is anything but 'well settled' on the issue ... [of] the validity of non-assignment clauses after a loss has occurred." *Id.* at 1238 (internal citation omitted). This observation was similar to one made by the trial court when it stated that "Pennsylvania law is unclear on this issue whether general stipulations prohibiting assignments absent an insurer's consent ... should apply only to pre-loss assignments." Trial Court Opinion at 4. The Superior Court noted that case law does not make clear when a "loss" occurs.

The Superior Court rejected Gulf's argument that *Fran & John's Doylestown Auto Ctr., Inc. v. Allstate Ins. Co.*, 432 Pa.Super. 449, 638 A.2d 1023 (1994), and *High–Tech–Enters. Inc. v. Gen. Accident Ins. Co.*, 430 Pa.Super. 605, 635 A.2d 639 (1993), mandated a finding that the assignment was invalid.

The Superior Court acknowledged that it could "only honor [the decisions in *Fran & John's* and *High–Tech–Enters.*] to the extent that they comport with the binding law" that this Court set forth in *Nat'l Mem'l Services, Inc. v. Metro Life Ins. Co.*, 355 Pa. 155, 49 A.2d 382 (1946). *Egger*, 864 A.2d at 1239. It stated that in *Nat'l Mem'l*, we noted that "there seems to be no sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured." *Id.* at 1240 (citing *Nat'l Mem'l*, 49 A.2d at 382–83). Recognizing that our holding in *Nat'l Mem'l* accorded with well-accepted principles of interpretation of insurance policies, the Superior Court concluded that the prohibition of an assignment after the loss has occurred would be void as against public policy.

Similarly, the Superior Court rejected Gulf's argument that the loss in this case was not fixed until the jury entered its verdict, which was one day after Foulke assigned its right to the excess insurance policy to Appellee. The court determined that although the exact amount of the loss was not known at the time of the assignment, the "risk, although not yet quantified to the penny by a jury, was in principle triggered by the injury itself and Foulke's personnel's conduct in

response thereto, matters that occurred long before Foulke's assignment of the policy to Egger." *Id.* at 1242.[4]

On June 20, 2005, we granted Gulf's Petition for Allowance of Appeal, limited to one issue, which was "[w]hether an assignee has standing to sue an insurer where an insured's assignment of its interests in an insurance policy is made to the assignee in violation of a policy restriction requiring the insurer's consent?" For the reasons that follow, we affirm the Order of the Superior Court.

## DISCUSSION

■ In the matter *sub judice*, we determine whether an assignment of rights that did not comply with the requirement of prior written consent is fatal to Appellee's claim of standing. For the reasons that follow, we hold that the assignment was valid and that it conferred standing upon the Assignee.

■ This matter involves an appeal from a trial court order granting summary judgment in favor of Appellee on the issue of the effectiveness of the assignment of the Gulf excess insurance policy. The appropriate construction of an insurance policy poses a question of law, and our review, therefore, is plenary. *Minnesota Fire Cas. Co. v. Greenfield,* 579 Pa. 333, 855 A.2d 854 (2004).

■ In reviewing a summary judgment order, we "will reverse the order of a trial court only where the court committed an error of law or clearly abused its discretion." *Mountain Vill. v. Bd. of Supervisors of Longswamp Twp.,* 582 Pa. 605, 874 A.2d 1, 5 (2005).

Gulf argues that the assignment of Foulke's excess insurance policy rights to Appellee was invalid because the policy required advance written notice, and no such notice was given. In the alternative, Gulf contends that the assignment failed

---

4. Additionally, the Superior Court addressed another issue that is not before the Court in the matter *sub judice* regarding whether Gulf's policy covered the actions of Foulke's employees or whether those activities were subject to a Professional Liability Exclusion in the policy. The court affirmed the finding of the trial court that ambiguities in the policy required a finding in favor of the insured that the services were covered.

because it took place prior to the "loss," which, in its view, did not occur until the jury returned its excess verdict.

Gulf concedes that Pennsylvania law "allows a post-lost assignment in spite of a non-assignment clause because a post-loss assignment cannot increase the risk to the insurer associated with an undesirable assignee, as the insurer's payment obligation is already 'fixed.'" Brief of Appellant at 17. However, Gulf posits that this is not the situation in the in instant matter. Gulf alleges that Foulke's assignment was a "pre-loss" assignment because it was made prior to the jury's verdict.

The trial court noted that "Pennsylvania law is unclear on this issue whether general stipulations prohibiting assignments absent an insurer's consent ... should apply only to pre-loss assignments." Trial Court Opinion at 4. Gulf's argument that the assignment was invalid pursuant to Pennsylvania law rests almost exclusively on two Superior Court decisions, both of which ignored our holding in *Nat'l Mem'l Services, Inc. v. Metro Life Ins. Co.*, 355 Pa. 155, 49 A.2d 382 (1946).

In its prior holdings in *Fran & John's Doylestown Auto Ctr., Inc. v. Allstate Ins. Co.*, 432 Pa.Super. 449, 638 A.2d 1023 (1994), and *High–Tech–Enters., Inc. v. Gen. Accident Ins. Co.*, 430 Pa.Super. 605, 635 A.2d 639 (1993), the Superior Court invalidated assignments that violated insurers' requirements for prior written consent. In those cases, the Superior Court relied on the plain language in the policies. As the Superior Court stated in the instant matter, with respect to *Fran & John's*:

> We reached this ruling in keeping with our courts' oft-stated commitment to interpret the language of an insurance policy according to its plain meaning. See *Lititz Mut. Ins. Co. v. Steely*, 567 Pa. 98, 785 A.2d 975, 978 (2001), ("[T]he goal of interpreting an insurance policy ... is to determine the intent of the policy.")

*Egger*, 864 A.2d at 1239.

However, in the matter before us, the Superior Court correctly acknowledged that *Fran & John's* and *High–Tech–*

*Enters.* did not consider the holding of this Court in *Nat'l Mem'l*. The trial court, however, did rely on our decision in that matter when it determined that Foulke's assignment of the Gulf excess insurance policy to Appellee was valid.

In *Nat'l Mem'l*, we were asked to determine whether the assignment of the proceeds of life insurance policies by the beneficiaries to an undertaker to pay for funeral costs of the insured was valid following the death of the insured. In that case, the insurance policy provided that the "Policy may be assigned to any national bank, state bank, or trust company, but any assignment . . . of this Policy or of any of its benefits to an assignee other than one of the foregoing shall be void." *Id.* at 382. On the day that the insured died, his beneficiaries assigned the proceeds of the policies to an undertaker who subsequently reassigned his interest to a finance company, the plaintiff in the case. The defendant insurance company refused plaintiff's demand for payment of the proceeds, on the basis of its opinion that the assignments were invalid.

Because the undertaker clearly was not a permitted assignee, the assignment violated the policy's express terms. The defendant insurance company argued that the express terms of the policy prohibited an assignment made after the death of the beneficiary. We rejected that contention, reasoning that:

> We . . . understand why an insurer would limit the right of the insured to assign his interests in a policy as otherwise some improvident or undersirable [sic] assignee might allow the policy to lapse for the nonpayment of premiums. **But there seems to be no sound reason for the insurance company to forbid or limit an assignment by a beneficiary of the amount due him or her after the death of the insured.**

> \* \* \*

> Moreover, the general principles applicable to the interpretation of insurance policies further support our interpretation. Text writers and judicial decisions very generally recognize that **stipulations in policies forbidding an assignment, except with the insurer's consent, apply only**

**to assignments before loss or death of the insured or the maturity of the policy.  An assignment of the policy or rights thereunder after the occurrence of the event, which creates the liability of the insurer, is not, therefore, precluded. . . . [A] provision in a policy, prohibiting an assignment after loss has occurred, is generally regarded as void, in that it is against public policy** so to restrict the relation of debtor and creditor by restricting or rendering subject to the control of the insurer an absolute right in the nature of a chose in action.

*Id.* at 382–83 (internal citations omitted) (emphasis added).

The general rule that we articulated in *Nat'l Mem'l* is that a non-assignment clause in an insurance contract is not enforceable after the loss has occurred.  The parties in the matter *sub judice* do not quarrel with that; rather, they dispute when the "loss" occurred.[5]  Appellee contends that "loss" refers to the date of the tortious conduct that caused the harm.  Gulf asserts that "loss" did not occur until the jury rendered its verdict.

The logic behind the general rule is that post-loss assignments do not invalidate the policy, thereby changing the risks the insurer undertook to insure; rather, they assign the right to a money claim.  *See* G. Couch, CYCLOPEDIA OF INSURANCE LAW § 35.7 (3d ed.  1995) ("The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.").

While *Nat'l Mem'l* involved life insurance policies and the matter concerns an excess insurance policy, this distinction does not warrant a different outcome or analysis.  The triggering event for coverage in *Nat'l Mem'l* was the death of the insured.  Accordingly, we found that there was no "sound reason for the insurance company to forbid or limit an assign-

---

5.  Gulf argues in the alternative that:  (1) the plain language of the non-assignment clause in the policy rendered the assignment invalid;  or (2) if the plain language of the policy is disregarded, the assignment was otherwise invalid because it was made prior to the loss.

ment by a beneficiary of the amount due him or her after the death of the insured." *Id.* at 382–83.

However, with the Gulf excess insurance policy, there was no death of an insured; rather, Foulke purchased coverage to protect itself against an award of damages exceeding the limits of its primary liability policy with respect to its activities at the PECO plant. Foulke provided plant protection and security services pursuant to its contracts with PECO. Gulf insured these activities of Foulke through its issuance of an excess insurance policy, "which provides coverage for any sum the insured is obligated to pay for bodily injury arising out of an 'occurrence.'" Trial Court Opinion at 2. It is an "Occurrence" that triggers the obligation of Foulke.

Relevant terms of the policy provided the following:

## I. Coverage

(1) We will pay on behalf of the "insured" those sums in excess of the "Retained Limit" which the "Insured" by reason of liability imposed by law shall become legally obligated to pay as damages for:

   (a) "Bodily Injury[,]" or

   (b) "Property Damage[,]" arising out of an "Occurrence" to which this insurance applies. This insurance only applies to "Bodily Injury" or "Property Damage" [ ] which occurs during the POLICY PERIOD stated in Item 2 of the Declarations (the "Policy Period").

(2) We will further pay on behalf of the "Insured" those sums in excess of the "retained Limit" which the "Insured" by reason of liability imposed by law shall become legally obligated to pay as damages for:

   (a) "Advertising Injury[,]" or

   (b) "Personal Injury"

first committed during the POLICY PERIOD stated in Item 2 of the Declarations (the "Policy Period").

Brief of Appellant at 25–26.

Consequently, in parsing the terms of the policy, the triggering event for coverage was **bodily injury** occasioned by

Foulke, **which arose out of an Occurrence** during the period of the policy. The policy defined "Occurrence" as "an accident . . . that results in 'Bodily Injury' or 'Property Damage' that is not expected or not intended by the 'Insured.' " Exhibit F, Commercial Umbrella Policy, Supplemental Appendix to Combined Reply in Support of Defendant Gulf Insurance Company's Motion for Summary Judgment, Section IV (DEFINITIONS) at H. The Occurrence was Egger's accident.

It is undisputed that Egger's accident occurred on September 5, 1997, that he immediately placed an emergency call for help to Foulke personnel, that it took approximately twenty minutes for the personnel to arrive and assist him, and that they arrived on the scene without rescue or first aid equipment. Trial Court Opinion at 2. The Foulke personnel decided to retrieve Egger from the confined space in which he was working, rather than administer first aid, and, in the meantime, Egger bled to death. *Id.*

In attempting to circumvent the principle that we articulated in *Nat'l Mem'l* that a restriction against a post-loss assignment is void, Gulf asserts that its loss did not arise until the jury reached its verdict and awarded damages in an amount exceeding the underlying $1,000,000.00 of primary insurance coverage. Because the jury reached its verdict establishing excess damages on February 9, 2001, Gulf asserts that the assignment of the policy on February 7, 2001, prior to that verdict, was an invalid pre-loss assignment. Gulf cites the policy language stating that it "will pay on behalf of the 'Insured' those sums in excess of the 'Retained Limit' which the 'Insured' **by reason of liability imposed by law shall become legally obligated to pay**" as support for its position that the loss does not occur until the time of the jury verdict: Exhibit F, Commercial Umbrella Policy, INSURING AGREEMENTS, I (COVERAGE), Supplemental Appendix to Combined Reply in Support of Defendant Gulf Insurance Company's Motion for Summary Judgment.

This argument lacks merit. First, as Appellee correctly notes, the term "by reason of liability imposed by law" could mean, for example: (1) only after a judgment has been

entered; (2) only after all appeals are exhausted and the verdict stands; (3) only after efforts to execute judgment have begun; (4) the occurrence upon which the liability is based (i.e., the death of Egger); or (5) only after the tender of primary coverage. Brief of Appellee at 22. This demonstrates the ambiguity of the clause that Gulf cites as support for its argument that this term means the jury verdict.

We have stated that where ambiguity exists in the interpretation of policy language, the ambiguity must be construed in favor of coverage. *Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983). Further, "[c]ontractual language is ambiguous 'if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *401 Fourth St., Inc. v. Investors Ins. Group*, 583 Pa. 445, 879 A.2d 166, 171 (2005) (internal citation omitted).

Gulf's position that "by reason of liability imposed by law" is synonymous with the jury verdict is weak at best, due to its ambiguity and does not support its position that there was no loss prior to the jury verdict. Clearly, it was within the purview of the insurance company to draft this provision in an unambiguous manner to reflect that Gulf's obligations did not arise until the jury reached a verdict in an amount exceeding the limits of the underlying liability policy. This it did not do.

Further, we note that when reading all of the sections of the insurance policy, it is clear that Gulf's responsibilities and role as excess insurer did not commence at the rendering of the verdict. For example, consistent with the fact that its obligation was triggered by the injury to Egger, its policy required the insured to notify it of any " 'Occurrence' or offense which may result in a 'Claim' or 'Suit.'" Exhibit F, Commercial Umbrella Policy, "CONDITIONS," E, Supplemental Appendix to Combined Reply in Support of Defendant Gulf Insurance Company's Motion for Summary Judgment.

Second, this Court has articulated that a "loss" is "the occurrence of the event, which creates the liability of the insurer." *Nat'l Mem'l*, 49 A.2d at 383. The event that

occasioned the liability of Gulf, was the "Occurrence" to which the policy applied; i.e., the bodily injury that Foulke caused to Egger on September 5, 1997.

Federal courts, when applying Pennsylvania law in analogous circumstances, have adopted our analysis and holding in *Nat'l Mem'l*, and validated post-loss assignments made without consent of the insurer. In *Viola v. Fireman's Fund Ins. Co.*, 965 F.Supp. 654 (E.D.Pa.1997), a tort plaintiff sued an umbrella liability insurer to recover under a policy issued to its insured, the individual who had attacked plaintiff, and then assigned the policy to the victim. In addressing an assignment clause that required the consent of the insurer, where no consent had been procured, the district court cited *Nat'l Mem'l* and found the assignment valid because **"despite the presence of a non-assignment clause in an insurance contract, '[a]n assignment of the policy or rights thereunder after the occurrence of the event, which creates the liability of the insurer, is not [ ] precluded.'"** *Id.* at 658 (citing *Nat'l Mem'l*, 49 A.2d at 383) (emphasis added).

Further, the court in *Viola* noted that:

> [A]fter a loss has occurred, the right of the insured or his successor in interest to the indemnity provided in the policy becomes a fixed and vested right; [and] ... is an obligation or debt due from the insurer to the insured, subject only to such claims, demands, or defenses as the insurer would have been entitled to make against the original insured.

*Id.*

The trial court noted that "the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply only to assignments before loss, and do not prevent an assignment after loss." Trial Court Opinion at 7 (quoting G. Couch, *COUCH ON INSURANCE* § 35:7 (3d ed.1995)). Courts in Delaware, Georgia, Wisconsin, Oregon, Iowa, and Texas have held that clauses that require the consent of the insurer prior to assignment prohibit only the transfer of rights prior to a loss and not after the loss has occurred. *See Int'l*

*Rediscount Corp. v. Hartford Accident and Indem. Co.,* 425 F.Supp. 669 (D.Del.1977); *Georgia Coop. Fire Ass'n v. Borchardt & Co.,* 123 Ga. 181, 51 S.E. 429 (1905); *Straz v. Kansas Bankers Sur. Co.,* 986 F.Supp. 563 (E.D.Wis.1997); *Spare v. Home Mut. Ins. Co.,* 17 F. 568 (C.C.D.Or.1883); *Conrad Bros. v. John Deere Ins. Co.,* 640 N.W.2d 231 (Iowa 2001); *McLaren v. Imperial Cas. & Indem. Co.,* 767 F.Supp. 1364 (N.D.Tex. 1991).

In another federal district court opinion applying Pennsylvania law, the court found that where an injury "which could potentially place liability upon the [insurers] ... occurred prior to the assignment," the non-assignment provision did not prohibit the insured from assigning its rights under its policies without the consent of the insurer. *Continental Cas. Co. v. Diversified Indus., Inc.,* 884 F.Supp. 937, 948 (E.D.Pa.1995).

In keeping with our holding in *Nat'l Mem'l,* the district court in *Continental* noted that:

> Generally, non-assignment clauses are included in insurance policies for the protection of insurers. Such clauses are designed to guarantee that an increase of the risk of loss by a change of the policy's ownership cannot occur without the consent of the insurer. Because non-assignment clauses limit the amount of risk that the insurer may be forced to accept, courts will generally strike down an insured's attempt to assign its policy to a new insured. Consistent with the general purposes of non-assignment clauses, however, courts are reluctant to restrict the assignment of an insured's right to payment which has already accrued. Therefore, because an insured's right to proceeds vests at the time of the loss giving rise to the insurer's liability, restrictions on an insured's right to assign its proceeds are generally rendered void.

*Continental,* 884 F.Supp. at 946 (internal citations omitted).

Gulf has not established in what regard Foulke's assignment of the policy to Egger increased its risk of loss. It merely suggests that, unlike the scenario in *Nat'l Mem'l,* its policy was one for excess liability, not for life insurance. While that

is true, Gulf offers no legal authority to support its notion that the assignment of a life insurance policy requires a different analysis than the assignment of an excess insurance policy. It merely concludes that "[t]he assignment in this case was necessarily invalid because it was made before the jury's verdict and hence before the loss was 'fixed' or made a 'debt due' under the plain text of the policy, which is wholly in accord with the increased risk principles espoused in *Nat'l Mem'l Services*." Brief of Appellant at 27.

Gulf confuses loss with the subsequent fixing of a precise amount of damages for that loss. Although the dollar amount of a life insurance policy is known at the time of the insured's death, and the exact dollar amount of Gulf's liability under the excess policy was not fixed until the jury returned its verdict, this does not establish increased risk to Gulf following the assignment.

We find that Gulf's explanation that it "*did*, in fact, experience an increased risk on account of the pre-loss assignment by Foulke[,]" Brief of Appellant at 27, defies logic as well as the reality of the course of action it chose to pursue during the underlying litigation. Gulf contends that when Foulke and its primary insurer settled with Egger, they "had no motivation to aggressively defend against her claims because Foulke's liability was fixed by the settlement." *Id.* Gulf also claims increased risk as a result of "Foulke's complicity" in failing to call a particular witness on the same day that Foulke and its primary insurer settled with Egger. *Id.* at 28. According to Gulf, this meant that the "jury was deprived of crucial testimony that could have diminished its award or even prompted a verdict for Foulke." *Id.*

These complaints border on the absurd, given that Gulf advised the court and Foulke before the jury verdict that it denied coverage for all claims and chose not to participate in the trial in any way. Gulf did this, despite the right afforded to it in its policy covering Foulke, which provided that:

We will, at our sole discretion, have the right and opportunity to associate and participate with you or any provider of

"Underlying Insurance" or other insurance in the investigation, negotiation, settlement, defense or trial of any "Claim" or "suit" reasonably likely to involve us under this policy. If we exercise such right, we will do so at our own expense. Exhibit F, Commercial Umbrella Policy, II DEFENSE SETTLEMENT, (4)(c), Supplemental Appendix to Combined Reply in Support of Defendant Gulf Insurance Company's Motion for Summary Judgment. The insurance contract furnished Gulf with the right to participate in the trial along with Security, the primary insurance carrier. Gulf elected not to do so and cannot be heard now to complain that the jury was deprived of hearing testimony that Gulf deemed favorable.

Foulke's primary insurer had tendered its full policy limit of $1,000,000.00 on the day the jury was selected. Appellee rejected that offer and demanded $1,600,000.00, thus implicating Gulf's excess policy. Because Gulf opted to deny coverage and not participate in the proceedings, any adverse consequences arising from that decision, real or purported, do not constitute increased risk arising from the assignment of the policy.

Gulf's risk remained the same, regardless of whether Foulke or Appellee held the policy. That risk was that a jury on some date subsequent to 1997 would assess damages in an amount greater than $1,000,000.00 for the fatal injuries that Foulke personnel caused Egger on September 5, 1997. Once Foulke, the original insured, acted negligently in causing the death of Egger, the bargained-for risk was realized and was not changed by the assignment of rights to Appellee.[6] The loss had occurred, and it remained only for that loss to be liquidated through legal proceedings.

The Superior Court correctly rejected Gulf's argument that the "loss" did not occur until the jury reached its excess verdict. It determined that

6. It is true, as Appellee recognizes, that an insured or assignee potentially could engage in some type of "illegitimate manipulation" of the variables involved in litigation. Brief of Appellee at 9. However, Appellee correctly notes that if such manipulation were to occur, the insurer would have the full array of affirmative defenses to negate its obligation to indemnify. *Id.*

The risk, although not yet quantified to the penny by a jury, was in principle triggered by the injury itself and Foulke's personnel's conduct in respect thereto, matters that occurred long before Foulke's assignment of the policy to Egger. We cannot let the language of the Policy outweigh the clear policy embodied by our Supreme Court in *National Mem'l Services.*

*Egger,* 864 A.2d at 1242.

Accordingly, we determine that whether or not the assignment was made prior to the jury verdict is irrelevant, as the obligation of Gulf to provide excess coverage, in the event of damages exceeding the limits of the primary policy, arose on the date of the occurrence in 1997.[7] The assignment changed only the identity of the party who was entitled to recover under the Gulf policy, in the event an excess verdict was obtained. Pursuant to our analysis in *Nat'l Mem'l*, because Gulf's risk was not increased following the assignment, since the assignment was subject "to such claims, demands, or defenses as the insurer would have been entitled to make against the original insured," *Nat'l Mem'l,* 49 A.2d at 383, the Superior Court correctly determined that the assignment was valid.[8]

Accordingly, we affirm the Order of the Superior Court.

7. The trial court's response to the argument of Gulf that the assignment was made pre-loss, rather than post-loss, differed from that of the Superior Court. It reasoned that:

> Although the assignment clause in the agreement between Egger and Foulke may have existed before the jury verdict, it was merely an agreement to assign and did not become an actual assignment until after the $3.5 million jury verdict. [E]vidence of this is the written agreement attached to Egger's Complaint which shows that the execution date of the agreement was "March 15, 2001[,]" [ ] over a month after the February 6, 2001, jury verdict.... Since Foulke assigned its rights under the Gulf policy to Egger after the loss ... the assignment "passes muster" under our Supreme Court's holding in *National* and is therefore valid.

Trial Court Opinion at 8. While this analysis is not without appeal, our holding that the loss occurred with the death of Egger in 1997 renders the date of the jury verdict irrelevant. Accordingly, we do not determine the merits of the trial court's construction.

8. Pursuant to the terms of the excess policy, Gulf also could have protected itself by participating in the litigation process.

Justices CASTILLE, EAKIN and BAER join the opinion.

Former Justice NIGRO did not participate in the decision of this case.

Chief Justice CAPPY files a concurring opinion.

Justice SAYLOR files a dissenting opinion.

Chief Justice CAPPY, concurring.

I join the Majority Opinion. I write separately to address the suggestion that our decision in the present appeal is merely advisory, which is raised by the inference that the assignment between Appellee Patricia M. Egger ("Egger") and Foulke Associates, Inc. ("Foulke"), taking place on March 15, 2001 after both Charles Egger's death on September 5, 1997 and the jury's excess verdict on February 9, 2001, is necessarily post-loss. *See Sgarlat v. Board of Adjustment of Kingston Borough,* 407 Pa. 324, 180 A.2d 769, 771 (1962) (reiterating that our courts concern themselves with facts and actual controversies; their obligations do not include deciding moot, hypothetical, fictitious and abstract principles of law.)

I believe that our opinion is not advisory in nature. For purposes of applying the guiding principles this Court set forth in *National Memorial Services, Inc. v. Metro. Life Ins. Co.,* 355 Pa. 155, 49 A.2d 382 (1946), to determine whether an insured's assignment of its interests in an insurance policy will be upheld because it was post-loss, the pre-verdict contract that Egger and Foulke entered on February 8, 2001, wherein Foulke agreed to assign its rights under the Gulf Insurance Company ("Gulf") policy to Egger in the event of an excess verdict, was the legally significant transaction. It is the February 8, 2001 contract that Gulf argues changed the risk that it undertook to insure, such that under *National Memorial,* Foulke's assignment to Egger was essentially pre-loss and should not be validated. Thus, despite the fact of the assignment's actual execution on February 9, 2001, there was a disputed question for this court to resolve in this appeal as to whether the assignment, which arose out of the pre-verdict

contract to assign, was post-loss within the meaning of *National Memorial.*

Justice SAYLOR, dissenting.

I respectfully differ with the majority's decision to invoke public policy to preclude the enforcement of a contractual provision restricting the assignment of the insured's rights under an excess liability insurance policy that occurred prior to the entry of an actual judgment in the underlying tort litigation.

In the first instance, I note that public policy determinations are usually better suited to the legislative, rather than the judicial forum. Thus, a high threshold must be met prerequisite to judicial intervention into private contractual affairs on public policy grounds. In this regard, this Court has explained that avoidance of unambiguous contractual terms on public policy grounds requires the demonstration of an .overriding public policy deriving from the laws and legal precedents, long governmental practice, or obvious ethical or moral standards. *See Hall v. Amica Mut. Ins. Co.,* 538 Pa. 337, 347–48, 648 A.2d 755, 760 (1994) (citing *Muschany v. United States,* 324 U.S. 49, 66–67, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). Further, it is only in cases in which there is a near unanimity of opinion concerning the applicability and importance of the salient policy that action is to be taken. *See id.* at 348, 648 A.2d at 760 (quoting *Mamlin v. Genoe,* 340 Pa. 320, 325, 17 A.2d 407, 409 (1941)).

I agree with the majority that this threshold is met relative to the disapproval of anti-assignment clauses pertaining to life and casualty insurance policies upon the accrual of a loss contemplated under the policy, for the reasons that the majority describes. *See* Majority Opinion, 588 Pa. at 293–97, 903 A.2d at 1223–24 (citing, *inter alia, National Mem'l Servs., Inc. v. Metro Life Ins. Co.,* 355 Pa. 155, 49 A.2d 382 (1946)). As the majority highlights, in the life and casualty insurance cases, there is a prevailing sentiment that the indemnity provided in the policy becomes sufficiently fixed and vested upon the accrual of a loss (the death of the insured or damage

to his property), such that there is no longer any legitimate function of an anti-assignment provision. *See National Mem'l Servs.*, 355 Pa. at 155, 49 A.2d at 383. I do not believe, however, that this reasoning is readily transportable to the present setting involving a pre-judgment assignment of rights and interests under a policy of excess liability insurance.

Cases involving liability insurance are more complex than the life and casualty cases, due to the substantial and direct involvement of a third-party interest, namely, that of the plaintiff in the underlying suit (here, Appellee), thus creating an additional layer of uncertainty concerning the liability insurer's obligation to make payments under the policy, particularly in the context of an excess insurer. Further, as the majority recognizes, there is a potential for manipulation in connection with a pre-judgment assignment to the plaintiff of a defendant's rights and interests under an excess liability insurance policy. *See* Majority Opinion, 588 Pa. at 303 n. 6, 903 A.2d at 1228 n. 6. Such potential represents a form of increased risk, affording the insurer a legitimate reason to guard against it by means of a contractual provision requiring its consent as a prerequisite to assignment, at least prior to the entry of a judgment or the effectuation of a comprehensive settlement of the underlying tort litigation.[1] I believe that this dynamic distinguishes the *National Memorial Services* line of cases, in which no such legitimate reasons were found.[2]

1. The majority's explanation that the insurer has a full array of affirmative defenses in the event of manipulation does not negate the risk, in that manipulation is inherently a covert activity and, therefore, it may be difficult to prove. Further, even if proof is available, the insurer will incur additional expense (the subject of an increased risk) in establishing it.

2. I also have difficulty with the majority's decision to fault Gulf for its decision to deny coverage, *see* Majority Opinion, 588 Pa. at 302–03, 903 A.2d at 1228, since the Court declined to consider the validity of Gulf's reasons for that denial. Notably, in addition to the issue on which this appeal was allowed, Gulf also sought to raise the following question: "If the assignee has standing and the assignment is effective, whether the negligent medical services provided by the insured were covered under the insurance policy?" The Court, however, issued a limited grant order, which had the effect of denying review on that issue. *See Egger v. Gulf Ins. Co.*, 583 Pa. 427, 879 A.2d 155 (2005) (*per curiam*). Further, as noted by the majority, the trial court determined that Gulf's

308

In summary, since I do not believe that the circumstances of this case present the kind of extraordinary situation in which the courts should act to void a private contractual undertaking on public policy grounds, I would reverse the order of the Superior Court affirming the judgment against Gulf.

denial of coverage was not made in bad faith. *See* Majority Opinion, 588 Pa. at 290–92, 903 A.2d at 1221.